## Case No. 11,539.

### The RALEIGH et al.

### SUNDRY MATERIAL-MEN OF NORFOLK AND PORTSMOUTH v. PIONEER TRANSP CO.

[2 Hughes, 44.] [1]

District Court, E. D. Virginia. Feb. 26, 1876.

MARITIME LIEN—STATE LIEN—SUPPLIES TO HOME VESSEL—ADMIRALTY JURISDICTION.

1. The act of assembly of Virginia, of January 20, 1866, c. 55 (page 171, Acts 1865–66), carried into the Code of 1873 as section 5 of chapter 147, gives such a lien for supplies upon a home vessel in favor of a home material-man as an admiralty court may make the foundation of a libel in rem, under the 12th rule in admiralty of 1872.

[Cited in The Hiawatha, Case No. 6,453; White v. The Cynthia, 2 Fed. 112; The General Burnside, 3 Fed. 231; Stewart v. Potomac Ferry Co., 12 Fed. 298; The J. E. Rumbell, 148 U. S. 18, 13 Sup. Ct. 502.]

2. The right which this statute gives the material-man, to attach the vessel for the supplies he furnished it on its credit, is presumed to be the ground on which he has credited the vessel, establishing a contract between the material-man and the vessel itself; and this contract (and not the lien of the state law) establishes the admiralty jurisdiction.

In admiralty. Libels against the company's steamers, Raleigh, L. G. Cannon, and Astoria. The Pioneer Transportation Company was duly incorporated on the 2d day of September, 1872, with its principal office at Portsmouth, Virginia. It became owner of several vessels, of which the steamers Raleigh, L. G. Cannon, and Astoria, which were severally libelled in these proceedings, were part. It engaged in the business of transporting passengers and freight between the

1 [Reported by Hon. Robert W. Hughes, District Judge, and here reprinted by permission.]

ports of Norfolk and Portsmouth and places in North Carolina. The evidence shows that its business was conducted at a constant and heavy loss. On the 15th of January, 1874, the company made a deed of trust conveying the steamer Raleigh to J. F. Crocker, to secure to the Bank of Portsmouth the payment of its note, then given for $10,000, and its renewals. On the 26th day of January, 1875, the company made a second deed of trust, conveying all three of the said steamers to L. D. Starke, to secure the payment of its note for $7000, and its renewals, to George W. Grice and others; and also to secure its note for $4000, and its renewals, to John T. Hill and others. On the 9th day of June, 1875, the company executed a third deed of trust, conveying the said three steamers to J. F. Crocker, to secure to the Bank of Portsmouth the payment of two notes and their renewals, one of them for $10,000, the other for $1600. This last ten thousand dollar note was the renewal of the same ten thousand dollar note which had been secured by the deed of the 15th of January, 1874. These three several deeds were all recorded in the office of the collector of customs of the United States, at Norfolk, in conformity with the requirements of the act of congress regulating the registration of such deeds. On the 22d day of June, 1875, Joseph G. Spruill, of Norfolk, a dealer in stores and provisions, filed three several libels in this court respectively against the three several steamers which have been mentioned, belonging to this Pioneer Transportation Company, for supplies furnished each of them, alleging that they were furnished on the orders respectively of the masters of the vessels, and on the credit of the respective steamers, and that they were necessary supplies, and that the credit of the steamers was necessary to procuring them. Soon after the filing of these libels, at different times, libels or petitions of intervention were filed, by mariners employed on the several steamers respectively, against the steamers, and also by other material-men for supplies furnished under the same circumstances as had been alleged by the original libellants. The Bank of Portsmouth also filed libels of intervention against each steamer, by J. F. Crocker, trustee, as also did Grice, Hill, and others by L. D. Starke, trustee, and claimed priority of lien upon the steamers over all libellants and petitioners except mariners. Answers were filed by the company in each case, in which the company avers that Norfolk is the home port of these steamers, and the place of residence of their owners, and in which it denies the averments of the libels as to the credit on which the supplies were furnished by the libellants. The claims of mariners and employés on the steamers were found to be greater against each vessel than could be paid without a sale, and a decree of sale was entered by consent in each of the cases, under which the vessels were sold, and this

class of claims paid off. The proceeds of sale of each vessel, less the amounts paid for wages and costs, are now on deposit in bank in the registry of the court, the amount of this balance in the case of the Raleigh being $8001.53, in that of the Astoria, $2743.-64, and in that of the Cannon, $3250.99, the whole amount being $13,996.16. Against this fund the claims of the mortgagees by deed of trust aggregate $22,600, and those of the material-men and others $6087.20. It is proved as to most of the claims of the material-men that the supplies furnished by them were furnished on the orders respectively of the masters of the steamers, and on the credit of the steamers; that the supplies were necessary, and that the company being insolvent when the supplies were furnished, the credit of the vessels was necessary to procuring the supplies. Of some of the claims, however, these facts are not true, and they will be excepted from the general ruling in this case.

The following counsel represented the various interests under adjudication: Baker & Walke, Scarburgh & Duffield, Charles Sharp, W. H. C. Ellis, John S. Tucker, James T. Allyn, Holladay & Gayle, Godwin & Crocker, W. W. Old, L. D. Starke, William Baker, White & Garnett, Harmanson & Heath, W. B. Martin; all of Norfolk and Portsmouth.

HUGHES, District Judge. It is evident from this state of facts that the question in the case is between the deed of trust creditors, who lent money to the company, and the material-men who furnished supplies for operating the steamers. If these supplies had been furnished in any other port than a port of the state of Virginia to these steamers owned here, there would be no doubt of the lien of the material-men, and its priority over that of mortgagees. The doubt in the case arises from sundry decisions of the supreme court of the United States, in which it is held that supplies furnished a vessel in a domestic port are not the subject of a maritime lien, and of a proceeding in rem against the vessel, unless the local law, that is to say the law of the state, gives a lien upon the vessel for such supplies. In the absence of such state law the lien is good only against vessels from other states.

The history of the rulings of the supreme court on this highly important question has been as follows: The material-man had a lien for supplies under the old admiralty law, and has now throughout Europe under the general admiralty law, upon all ships and vessels, without any distinction between foreign and domestic vessels. Some of the authorities on the subject may be found cited in 2 Pars. Shipp. 322; Ben. Adm. § 272, and notes; and The Calisto [Case No. 2,316]. This was so in England until a decision of the house of lords, in the reign of Charles II., took the lien away in the case of domestic vessels, and left the material-man to his common law lien, which was only good where possession of the vessel was retained. But even in England the lien of the material-man on a domestic vessel has been restored by act of parliament since 1840, and this lien follows the vessel independently of possession. In consequence of several rulings of the supreme court of the United States, and not by any act of congress, it was for a long time a part of the American admiralty law, that material-men had not a lien for repairs or supplies upon domestic vessels, unless it was given by the local law. Those rulings of that court have been ascribed to the "insensible" influence upon its justices of the rulings of the English common law courts on the subject, before 1840. While the supreme court held this doctrine, it established the 12th rule in admiralty, in the original form of that rule, by which it gave the proceeding in rem against a domestic vessel to the material-man, only where the law of the state gave him a lien. Afterwards, in 1859, the supreme court amended rule 12 so as to take away this proceeding in rem altogether from the material-man, thus ignoring the laws of such states as gave the lien. This rule, thus amended, continued in that form until 1872, when the supreme court again amended it, and provided, that "in all suits by material-men for supplies or repairs, or other necessaries, the libellant may proceed against the ship and freight in rem, or against the master or owner alone in personam." The adoption of this rule seemed to imply that the supreme court had determined to abandon the inconvenient distinction which it had been making on this subject between a domestic and foreign vessel, whereby it had established a variable maritime law, changing with the boundaries and with the legislation of each state. The rule of 1872 seemed to imply that the law of maritime lien, as to material-men, was to be uniform in the United States, and in conformity with that law as it was enforced in the maritime courts of all or nearly all nations of the world. But the recent decision of the supreme court in The Lottawanna Case, 21 Wall. [88 U. S.] 558, destroys this implication, and re-establishes the doctrine that the material-man has not a lien for supplies furnished upon the credit of a vessel, if it be a domestic vessel, unless the law of the state give such a lien as can be treated by an admiralty court as creating a maritime contract between the material-man and the vessel itself. The principles on which that court grounds the distinction it thus makes between foreign and domestic vessels are these: The foreign vessel is a wanderer; neither her owner nor master being known in the port where she seeks to obtain supplies. When furnished, these are necessarily furnished on her own credit, and not on that of her owner or master. Being herself thus the obligor, the admiralty gives a proceeding against herself

in rem. But in a domestic port a vessel's owner or master is supposed to be known, and, if supplies are furnished, they are presumed to be furnished on the personal credit of the master or owner, and the admiralty does not give the proceeding against the vessel herself. But if the local law gives a lien upon the vessel herself, then the admiralty will presume, if credit is given the vessel, that it is given on the faith of the local lien, and therefore will enforce the contract by the proceeding in rem. It is not the lien itself which the admiralty enforces in such a case, but the contract which arose on the faith of the lien.

It was contended at bar that the legislature of any particular country cannot create a maritime lien, and that even if legislation could do so in the United States, such a thing could only be done by national and not by state legislation. This proposition would seem to be negatived by the supreme court in its rulings in several cases, more especially in that of The Lottawanna [supra], its latest decision on the subject. In that case it said: "It cannot be that the framers of the constitution contemplated that the (maritime) law should forever remain unaltered. Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed. * * * As to the right of material-men in reference to supplies and repairs furnished to a vessel in her home port, there does not seem to be any great reason to doubt that congress might adopt a uniform rule for the whole country. * * *" Page 577. "It seems to be settled in our jurisprudence that so long as congress does not interfere to regulate the subject, the rights of material-men furnishing necessaries to a vessel in her home port may be regulated in each state by state legislation. State laws, it is true, cannot exclude the contract for furnishing such supplies from the domain of admiralty jurisdiction, for it is a maritime contract, and they cannot alter the limits of that jurisdiction, nor can they confer it upon the state courts so as to enable them to proceed in rem for the enforcement of liens created by state laws, for it is exclusively conferred upon the district courts of the United States. They can only authorize the enforcement thereof by common law remedies, or such remedies as are equivalent thereto. But the district courts of the United States, having jurisdiction of the contract as a maritime one, may enforce liens given for its security, even when created by state laws. The practice may be somewhat anomalous, but it has existed from the origin of the government. * * * Whatever may have been its origin, and whether or not it was based on the soundest principles, it became firmly settled, and it is now too late to question its validity. It is true that inconveniences arise from the often intricate and conflicting state laws creating liens, * * * but where a lien does exist it removes all obstacles to a proceeding in rem, if credit is given to the vessel. It would undoubtedly be far more satisfactory to have a uniform law regulating such liens, but until such law be adopted (supposing congress to have the power), the authority of the states to legislate on the subject seems to be conceded by the uniform course of decisions." Pages 580, 581. I do not myself think, however, that it is necessary for the state law to create a maritime lien as such, in order to confer upon the admiralty court power to proceed in rem. I think the mere fact of the state's giving a lien upon the vessel for the satisfaction of a maritime contract converts that contract into one between the material-man and the vessel itself, and thus makes such contract the subject of the admiralty proceeding in rem.

The principal inquiry, therefore, in the present case, is whether the law of Virginia gives a lien for supplies upon the vessel receiving them. The act of assembly of January 20, 1866, c. 55 (page 171, of the Acts of 1865–66, carried into the Code of 1873 as section 5 of chapter 147), is the only statute which is claimed to create such a lien. It is a part of the history of this act that it was drawn by a skilful lawyer (Mr. Duffield) of this city, for the purpose of establishing a lien as nearly as possible equivalent to the maritime lien, and for the further purpose, if possible, of giving to the state courts jurisdiction of proceedings in rem to enforce this lien. This latter effect of course the act could not have. The question is, whether the act establishes such a lien as the admiralty court can enforce as creating a contract between the material-man and the vessel itself. The act is in these words: "If any person has any claim against the master or owner of any steamboat, or other vessel, raft, or river craft, found within the jurisdiction of this state, for materials or supplies furnished or provided, or for work done for, in, or upon the same, or for wharfage, salvage, pilotage, or for any contract for the transportation of, or for any injury done to any person or property by such steamboat, or other vessel, raft, or river craft, or by any person having charge of her, or in her employment, such person may, either in a pending suit or without the previous institution of any suit, sue out of the clerk's office of the court of the county, or the circuit court of the county, or of the court of the corporation, or of the circuit court of the corporation in which such steamboat, or other vessel, raft, or river craft may be found, an attachment against such steamboat, or other vessel, raft, or river craft, with all her tackle, apparel, and furniture, or against the estate of such master or owner; and it shall not be necessary, in such attachment, to set forth the name of such master or owner. The order of publication required by the twentieth section of this chapter, may be against the owner or master of the steamboat, or other

vessel. raft. or river craft attached, and against the person liable by description and without setting forth his name. Any attachment may be sued out under this section. for a cause of action that may have arisen without the jurisdiction of this state, if the steamboat, or other vessel, raft, or river craft be within the jurisdiction of this state at the time the attachment is sued out or executed."

I do not think it necessary that the state should do more than give a lien upon the vessels: I do not think it necessary that it should give a maritime lien, eo nomine, but I shall examine this act as if the latter were necessary. The point of inquiry, therefore, is whether this act constitutes a right, equivalent to what is known to the modern maritime law as a lien? I say modern maritime law, because the word lien, of most various meanings, was not known to the law maritime until modern times. It has been adopted into the nomenclature of that law from the common law of England, but does not carry the same technical meaning there which belonged to it at common law. In the latter, the term lien signified a right merely to hold property until a claim of the holder against the owner was satisfied. By the maritime law the right in the thing exists irrespectively of possession or of ownership, and the term lien in a maritime sense signifies a special proprietorship in the thing, giving a right to pursue, take, and hold it. By statute the right to take as well as to hold has been given in some special cases of liens at common law, but the leading distinction between the common law lien and what is now called the maritime "lien" is, that at common law it is only a right to hold against the owner, while in admiralty it is a right to take against the world, as well as to hold, for the satisfaction of a maritime claim. The common law lien grows invariably out of a right of action in personam against some personal defendant. It is incidental to a claim against a person, and is enforced against property because of the claim against its owner. It is dependent upon the claim against a personal defendant. But in admiralty the owner of the ship is ignored; the ship itself bears the name of a person, is treated as the defendant, and is proceeded against as itself the obligor or debtor, without reference to its ownership. The common law lien is, therefore, in its theory, nature, and incidents, quite a different right from what is now called a maritime "lien," and it is probably a subject of regret that the common law term has been adopted into the technology of the admiralty law.

Still another difference between the common law and the maritime lien consists in the fact that the admiralty court, in enforcing the latter, gives title to the vessel or thing upon which the lien attaches as against the world; whereas, the common law court gives only such title as the defendant had out of whose liability the lien grew. The admiralty enforces a jus in re, and its proceeding is in rem directly against the thing itself; whereas, the common law court deals only with the obligation of the owner of the thing, and enforces a right in the thing only as incidental to that obligation. Wherever there is a maritime lien, it is in the nature of a proprietary interest, and it adheres to the thing (and its proceeds), into whose hands soever it may go, in any place on the globe. But the common law lien, unless extended by statute, is lost by the loss of possession, vanishes when the thing passes beyond the municipal jurisdiction. and has no proprietary quality or force. This quasi proprietary interest, this right to go after, and take, as well as hold against the world, constitutes the difference between the maritime lien, and that common law lien which the citizen of Virginia already had in 1866 without any additional legislation. The question, therefore, is what was the object of the special legislation on this subject which the general assembly of Virginia enacted on the 20th of January, 1866? Was it the object of that act, as far as state legislation could do so, to constitute a lien beyond that given by the common law, and equivalent to the maritime lien; and did it employ language competent to that object? As the word lien is not a maritime term, of course the failure to use it in a statute is no argument that the statute does not confer the lien. On the contrary, whenever it is the object of the legislator to establish a lien intended to be equivalent to a maritime lien, it is most judicious for him to use terms which shall give the right to take and hold, irrespectively of ownership, and to avoid the use of the word lien; for this term, if used, is liable to be technically interpreted as carrying only its common law signification. I think I may legitimately infer and conclude that such was the object of the draftsman of the act of assembly of Virginia of January 20th, 1866, for the "attachment of steamboats and other vessels found within the jurisdiction of the state," and of the legislature in enacting it. The peculiarity of this statute of Virginia is, that it is not, as in other states, incumbered by a multitude of conditions and special provisions, making the liens which it creates contingent upon the performance of various acts by the attaching claimant. Only one section of the chapter of the Code of which it is a part (the 12th, making the attachment a lien from the time it is levied) can be pretended to limit the right given by statute in any respect; and that section, from the terms it employs, seems to have no reference whatever to this statute. The statute, as it has been quoted above, is the whole law of Virginia on the subject; and it gives to any person who has a claim against a vessel for supplies and repairs a right to follow it wherever it may be found in the jurisdiction of the commonwealth, to take it by proper process, and to hold it for the satisfaction of

his claim. It recognizes the admiralty principle that a claim may be against the vessel, independently of the owner; and authorizes the vessel to be proceeded against regardless of the owner, by process in rem. Certainly is such a right equivalent to a maritime lien.

It cannot be contended that the actual suing out of attachment process from a state court against property already libelled in this court was necessary to the obtaining of the lien given by the statute. The right of the material-man to attach the vessel for the supplies he furnishes is presumed to have been the ground on which he credited the vessel, and is treated as establishing a contract between the material-man and the vessel itself. But even if that right did not exist until process issued, the libels here were equivalent to the attaching process authorized by the state law. The moment that the libels were filed in this court, that moment did the right to sue out such process become nugatory, and was the suing out of it rendered useless. Chief Justice Chase, in Re Wynne [Case No. 18,117]. said on this subject: "Whether the distress warrant or attachment be regarded as a proceeding for obtaining or for enforcing a lien, each was equally unwarranted (after the commencement of the proceeding in the United States district court). Buckey v. Snouffer, 10 Md. 149. * * * Liens of various descriptions, and may be enforced in different ways; but we think it sufficient to say here, what seems to us well warranted in principle and by authority, that whenever the law gives a creditor a right to have a debt satisfied from the proceeds of property, or before the property can be otherwise disposed of, it gives a lien on such property for the payment of such debt. And we think that a lien of this sort is given by the 12th section of chapter 134, tit. 41, of the Code of Virginia." From the comprehensive and unrestricted terms of the act of assembly of Virginia under discussion, I think the conclusion is irresistible, that the legislature did intend by it to give such a lien upon a vessel as the admiralty court may treat as establishing a contract between the material-man and the vessel itself. By this statute it gives such a lien as completely as state legislation can do so. It gives him the right to pursue, take. and hold the vessel for his claim. True it is, that at last and at best this is but a statutory lien; and true it is that the admiralty court does not affect to enforce statutory liens. as such. But the admiralty court has jurisdiction of the contract as a maritime contract, and, seeing that the state law gives an unconditional lien to the material-man for supplies. it implies that the material-man. knowing that he had such a lien, gave credit to the ship on the faith of it. It therefore treats the contract as made between the man and the vessel itself, and enforces this maritime contract by the proceeding in rem against the vessel which received the supplies. "The practice may be anomalous," as the supreme court says in the Lottawanna Case, "but it has existed from the origin of the government, it has become firmly settled, and it is now too late to question its validity." Where the state law gives such a lien as this law does upon a vessel, the contract being a maritime contract, there the lien, being attached to the contract, can be enforced by the admiralty court, according to the mode of administering remedies in the admiralty. 1 Conk. 78, and cases there cited.

The remaining question is, do these liens take precedence of all liens other than those for mariners' wages? See 2 Pars. Shipp. & Adm. 149, and cases there cited. There is no doubt that they do. The claims of material-men are held, by the maritime law, in equal favor with the wages of seamen; repairs and supplies being no less essential than the services of mariners to furnish "wings and legs" to the ship to enable her to complete her voyage for the benefit of all concerned. In fact the mortgagee simply takes the place and stands in the shoes of the owner as to the material-man, and the claims of material-men which the maritime law makes good against the owner of an unincumbered ship, are good against the mortgagee of a ship incumbered by recorded deed. There is certainly nothing in the act of congress providing for the registration of these mortgage deeds which gives them a superiority over maritime liens. See Reeder v. The George's Creek [Case No. 11,654]. The principle on which this priority of the material-man over the mortgagee is allowed, is, that he furnishes what is for the benefit of all who are interested in navigating the vessel; and it would be hurtful to commerce to deprive the vessel of the credit thus to obtain repairs and supplies whenever and wherever needed. The only questions are: were the supplies necessary. were they furnished on the credit of the vessel, and was it necessary to employ this credit? Indeed. this latter requisite seems latterly not to be insisted on. See The Lulu, 10 Wall. [77 U. S.] 197, and The Grapeshot, 9 Wall. [76 U. S.] 129. The authorities for the two general propositions are so numerous that I refrain from giving the references to them.

I must notice in conclusion a proposition which was advanced in argument, that the law of Virginia under consideration is in its strict terms exclusively remedial; and that, in so far as it seeks to give the remedy in rem in the state court, it is unconstitutional, and is therefore wholly void as to any advantage it could confer upon a material-man having a claim for supplies against a domestic vessel. The proposition is hardly tenable. It very frequently is the case that substantive rights are created by remedial laws. As to this law of Virginia, it is to be said. as Chief Justice Chase said of the Virginia law of lien for rent, that the lien is

created through necessary implication by the very enactment of the remedy, even though no words be used expressly declaring the right or creating the lien in specific terms. No lien is more unquestioningly recognized in Virginia than this lien for rent which is created by a law strictly remedial in its terms; and if from any circumstance, such as the goods bound by lien coming into the custody of another court, the distress warrant should cease to be a remedy in any particular case, it would hardly be contended that the lien had fallen along with the remedy to enforce it. The mere granting a remedy presupposes and by implication establishes the right for which it is given; but the converse is not true; that there may be a remedy without a right to support it. And if along with the right on which it rests, a remedy is once given, and if from any circumstance, unconstitutionality or other, the remedy itself fails, the right remains. In respect to this law of Virginia, the right of lien having been given in giving the right of remedy, the lien remains even in cases where the remedy is inadmissible. I will therefore sign an order directing the payment out of the proceeds of the sale of the three vessels, now in the registry of the court, the claims of material-men for the supplies respectively furnished by them to the respective steamers on the credit of each steamer. The claims of those dealers who furnished supplies generally to the company, and not for any specific one of their vessels, are not liens, and of course cannot be paid here. A decree in personam against the company, however, will be given in their favor.

I have yet to deal with two or three subordinate questions. These are as follows: 1st. Have the masters of these several steamers a lien for their unpaid wages each upon the steamer he commanded? 2d. Have they a lien for the advances of money which they made to the crews of the respective vessels? 3d. Has the agent in Norfolk of the company a lien for his disbursements upon the several steamers? 4th. Have the owners of the wharf which was leased to the company and which was used by these vessels, a lien upon them for the unpaid rent due upon the lease?

1st. As to the first question, I am obliged to rule against the claims of these masters; and do so with extreme reluctance on account of the strong equity of their claims for honest and faithful service. The law is too well settled to be brought now into question. It is founded on a consideration of the great inconvenience that would result to commerce, if on a change of the master of a vessel for misbehavior or other cause, he could keep possession of the ship until he was paid; or if abroad, could enforce his lien and compel a sacrifice of the ship. In this country, this doctrine is only held as to the ship, but the master is allowed his lien on the freight;

chiefly on the ground that the objection just stated to his having a lien on the ship does not apply as to the freight; and of the strong equity of his claim.

2d. I am equally bound to rule against the masters as to their claims for disbursements. These, however good against the owners or employers, do not give a lien upon the ship to the master, although they do upon the freight. The law is too well settled to be now called in question, and is founded upon the same considerations which have been stated as to wages. I can give the masters only decrees in personam against the company.

3d. It is doubtful whether the agent for a particular ship has a lien for disbursements upon that ship; but, however that may be, the agent for a line of steamers, disbursing for them generally, has no lien upon any particular vessel for a balance against the owners on general account. However valid and equitable Mr. Cappell's claim may be against the owners, he has no specific lien upon these several steamers for disbursements as against mortgage incumbrances. He can have nothing but a personal decree against the company.

4th. The executors of W. E. Taylor claim, by petition under the 43d rule in admiralty, $652.86 for rent due them from 1st May to the 6th of September, 1875, on a lease, which commenced on the 1st of January, 1875, of wharf property, made to the Pioneer Transportation Company. These executors are not wharfingers. Their claim is not for wharfage. The company itself being the lessee, was its own wharfinger. The claim of the executors is for rent; and such a claim is not a maritime claim. And therefore the claim cannot be sued for in the admiralty, and this court had no jurisdiction of it, except as a court of equity under the 43d rule of admiralty. The claim stands in this court subordinate to those for mariners' wages and supplies furnished by material-men, and is subject to these priorities over it. This claim for rent must be adjudicated upon, precisely as it would be in a common law court. It has priority over the claim of the Bank of Portsmouth and of G. W. Grice, John T. Hill, and others, under the trust deeds of the 26th January and of the 9th June, 1875, but not over the claim of the Bank of Portsmouth under the trust deed of the 15th January, 1874. Their claim binds the surplus of the funds arising from the sales of the Astoria and Cannon after satisfying that due the material-men upon those steamers, and I will sign an order directing its payment out of those funds.

There was no appeal from the decrees in these causes; the bar all agreeing with the court in its construction of the state statute reviewed.